C. E. McGilton *et al.* Appellants, *vs.* The St. Louis National Stock Yards, Appellee.

*Opinion filed April 18, 1912.*

1. Negligence—*duty of a stock yards company which undertakes to dip tick-infested animals.* If a stock yards company undertakes the duty of dipping tick-infested animals for the convenience of its customers it must obey the regulations upon that subject adopted by the Department of Agriculture under the act of Congress creating the Bureau of Animal Industry, and while it is not liable to the owner of the animals for damages if it obeys such regulations, yet it cannot rely upon an unauthorized waiver of the regulations by an inspector of such bureau.

2. Same—*when question whether a stock yards company was negligent is for the jury.* Whether a stock yards company, in contracting to dip tick-infested horses, was guilty of negligence in using a crude oil not prescribed by the Department of Agriculture is a question for the jury, even though the use of other oils is sanctioned by the department under certain conditions if the matter is first explained to the owner of the animals and even though the oil used was selected by an inspector of the Bureau of Animal Industry, where there is no evidence that the oil used was approved by the Secretary of Agriculture or that the owner of the animals knew anything about the oil used or consented to its use in place of the oil prescribed.

Appeal from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of St. Clair county; the Hon. George A. Crow, Judge, presiding.

W. E. Knowles, and D. J. Sullivan, for appellants.

M. W. Borders, and Dan McGlynn, for appellee.

Mr. Justice Farmer delivered the opinion of the court:

This is an action brought in the circuit court of St. Clair county at the April term, 1910, by C. E. McGilton and E. E. Horn, partners doing business under the name and style of McGilton & Horn, against the St. Louis National

Stock Yards, to recover damages for negligently causing the death of seventy-seven horses and injuring thirteen others belonging to the appellants, which, it is alleged, was caused by negligently dipping them in a vat of crude oil in appellee's stock yards in East St. Louis for the purpose of destroying ticks with which they were infested. At the close of all the evidence the trial court instructed the jury to find the defendant not guilty. Judgment was entered upon the verdict thus returned and an appeal was taken to the Appellate Court for the Fourth District. That court affirmed the judgment and granted a certificate of importance, and the case is brought to this court for further review.

Appellee was engaged in doing a general stock yards business near the city of East St. Louis, and possessed yards, pens, sheds, barns and other equipment necessary to carry on its work. Appellants are dealers in horses, and for several years have been purchasers of horses in the yards of appellee for re-sale to local customers. On the 29th of June, 1909, appellants bought ninety head of young horses received in appellee's yards the day before from Texas, paying $2512.50 for the lot. They were infested with ticks, which, if allowed to spread among domestic cattle, are supposed to disseminate Texas or splenetic fever. The horses were placed in quarantine pens by appellee when received, and when sold appellants understood they would have to be dipped in a solution for the destruction of ticks before the government regulations would permit them to be removed. Appellee handled both cattle and horses from tick-infested districts of the south and west, and had provided a vat in its yards in which to dip stock in a solution for the destruction of ticks. The superintendent of appellee agreed with appellants to dip the horses for fifty cents per head, and appellant McGilton testified the superintendent said it would not hurt them. The superintendent denied this. On the third day of July, appellee, by its ser-

vants, dipped the horses in crude petroleum obtained from the Chanute, Kansas, district. The vat in which they were dipped was twenty-five or more feet long, about three feet wide and about eight feet deep. The oil in the vat was five or six feet deep. The entrance to the vat for stock was from a pen through a chute, where the animal walked on a heavy plank balanced on a pivot. When the animal passed the pivot the end of the board next to the vat would tilt downward and throw the animal into the oil. If the horses were not entirely submerged, oil was dipped from the vat and poured on the parts that had not been submerged. After being dipped the horses were taken back to the pens in appellee's yards and locked up, to be kept until it could be ascertained whether the ticks had been killed. They were fed by appellee at appellants' cost, but appellants were permitted to enter the pens and examine them. The next day after being dipped some of the horses were in bad condition and the following day some of them died. They continued to die until July 13 or 14, when appellants were allowed to remove them from appellee's yards. At that time about twenty horses had died, and the remainder were taken to a pasture in Randolph county, where there were grass, shade and water. They continued dying until seventy-seven of them were dead. The remaining thirteen were brought back to East St. Louis in poor condition and sold for $12.50 per head. The horses were all affected alike. Their bodies would swell, their hair fall off and their hides crack open. It conclusively appears that the death of the horses was the result of dipping them in the oil.

The only question for our determination is whether there is any evidence tending to show appellee was guilty of any negligence in the use of the kind of oil in which the horses were dipped. Appellee's contention is that it acted in accordance with the rules and regulations of the Federal Department of Agriculture, promulgated pursuant to act of Congress, and in selecting the oil to be used and

in dipping the horses it acted under the advice and direction of an inspector of the Bureau of Animal Industry, having charge of the enforcement of the law relating to inter-State shipment of stock from tick-infested districts.

The act of Congress referred to is an act entitled "An act for the establishment of a Bureau of Animal Industry, to prevent the exportation of diseased cattle and to provide means for the suppression and extirpation of pleuro-pneumonia and other contagious diseases among domestic animals." Pursuant to authority conferred by that act the Department of Agriculture adopted and promulgated certain rules and regulations. Regulation 17 is as follows:

"*Regulation 17*—At any time of the year, cattle of the quarantined area or other cattle exposed to or infected with ticks (*margaropus annulatus*) which have been properly dipped in Beaumont crude petroleum or otherwise treated in a manner approved by the Secretary of Agriculture, under the supervision of an inspector of the Bureau of Animal Industry, and which have been examined and certified by the said inspector to be free of infection, may be shipped inter-State, subject only to such restrictions as may be imposed by State, territorial or district officers at points of destination: *Provided,* that when cattle are to be dipped, as specified herein, they shall, within six hours immediately prior to dipping, be given an opportunity to drink sufficient water to quench their thirst. Shipments of cattle that have been dipped or treated as herein provided shall be forwarded in clean, disinfected cars, shall be accompanied by the certificates of dipping or treatment issued by the inspector supervising the same, and shall not be driven through the quarantined area or be unloaded therein except as to such points as may be designated in the rules of the Secretary of Agriculture. The inter-State movement of horses and mules infested with ticks (*margaropus annulatus*) may .be made only in accordance with the regulations and rule governing the inter-State movement of tick-infested cattle."

It will be seen that regulation specifies Beaumont crude petroleum in which to dip cattle. No other oil or solution is recommended. Other treatment than dipping in Beaumont crude petroleum may be permitted if approved by the Secretary of Agriculture and given under the supervision of an inspector of the Bureau of Animal Industry. Regulation 17 applies wholly to cattle, except the last clause, which provides that inter-State movement of horses and mules infested with ticks may be made only in accordance with the regulations and rules governing inter-State movement of tick-infested cattle. Appellee was subject to the control and supervision of the Bureau of Animal Industry and the regulations adopted and promulgated in pursuance of the act of Congress for the purpose of carrying out the provisions of said act. While it was not obliged by law to make provision for dipping infested animals, as it was not engaged in the business of buying and selling stock, it was unquestionably a convenience to appellee's patrons who shipped stock to it and those who purchased the stock, and appellee would not be guilty of negligence if it obeyed the rules and regulations of the government. The oil in which appellants' horses were dipped was not Beaumont crude petroleum but was crude petroleum from the Chanute, Kansas, oil district, and differed in specific gravity and in other respects from Beaumont oil. Representatives of the appellee testified they procured Chanute oil by direction of Dr. Clancy, who was an inspector of the Bureau of Animal Industry at appellee's yards, and Dr. Clancy testified to the same effect. Previous to dipping appellants' horses appellee had dipped cattle in the same oil but had dipped only two horses in it. We do not think Dr. Clancy, or any other inspector of the Bureau of Animal Industry, had any authority to relieve appellee from the obligation to obey the regulations of the government. Counsel for appellee insist these regulations have the force of law. If this is true, they could not be suspended or altered by an agent ap-

pointed to see to their enforcement and observance. If appellee failed to obey the regulations adopted by the government for dipping animals, those regulations would not be a protection to it. As we interpret regulation 17, if Beaumont crude petroleum is not used, no other method of treatment is authorized unless approved by the Secretary of Agriculture, and we find no warrant for the use of a different oil or a different method by direction of an inspector.

Appellee introduced in evidence what is called a "service announcement" of the Bureau of Animal Industry, which is as follows:

*"Crude oil for dipping cattle.*—Inspectors having charge of official dipping of cattle may, upon request of the owner, permit the use of crude petroleums which do not strictly conform to the specifications of the department with respect to boiling point, gravity and sulphur content. In such cases it must be explained to the owner that the department, as in all other cases, assumes no responsibility for the effect of such oils upon the cattle or upon the disease. If such dippings are carried out, the cattle should not be passed by the inspector until he has assured himself that the treatment is efficacious. In addition the inspector should forward a quart of the oil used, to the Biochemic Division, Bureau of Animal Industry, U. S. Department of Agriculture, Washington, D. C., together with a report showing the effect of the oil on the cattle and on the ticks or scab mites, as the case may be."

This was authority to the inspector having charge of dipping cattle, upon request of the owner, to permit the use of crude petroleum not conforming to the specifications of the department, after first explaining to the owner that the department assumed no responsibility for the effect of such oils upon the cattle or upon the disease. It does not appear from the testimony that appellants ever made a request of an inspector about dipping the horses. One of them, McGilton, talked to appellee's foreman and made a .

contract with him and the price to be paid, but he testifies he told appellee's foreman he did not want them dipped if it would injure them; that the foreman replied they dipped cattle all the time; that it did not injure them and would not injure the colts. He further testified he knew nothing about the nature of the oil in which the horses were dipped and did not know whether it would injure them. He stood by and saw the horses dipped and rendered some assistance. The dipping was superintended by one of the government inspectors in appellee's yards. If it had been admitted, or if the uncontradicted evidence showed, that Chanute oil was used with the knowledge and permission of appellants, in accordance with the service announcement above quoted, that announcement would have been a protection to appellee, but this was not admitted nor shown to be a fact by the uncontradicted testimony. According to the proof, the oil had the effect of closing the pores in the skins of the horses, obstructing the operation of the sweat glands and causing disease in the kidneys. The same oil does not have the same effect on cattle, as the pores in their skins and their sweat glands are not like those of horses.

The evidence tends to show that appellee adopted an oil not designated by the government regulation nor approved by the Secretary of Agriculture, and appellants' evidence is that they knew nothing about the character of the oil and made no request for the particular oil used. We think, therefore, it was a question for submission to the jury whether, under all the evidence, appellee was guilty of the negligence charged. It was error, therefore, for the trial court to direct a verdict, and the Appellate Court erred in affirming the judgment.

The judgments of the Appellate Court and trial court are reversed and the cause remanded to the circuit court of St. Clair county.                 *Reversed and remanded.*